# United States Court of Appeals

## For the First Circuit

No. 07-1455

RICHARD M. NAULT,

Plaintiff, Appellant,

v.

UNITED STATES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Torruella and Lynch, <u>Circuit Judges</u>,
and Stahl, <u>Senior Circuit Judge</u>.

<u>Robert R. Lucic</u> with whom <u>Peter T. Beach</u>, <u>Courtney H.G. Herz</u>,
and <u>Sheehan Phinney Bass & Green, P.A.</u>, were on brief for
appellant.
<u>Deborah K. Snyder</u> with whom <u>Richard T. Morrison</u>, Acting
Assistant Attorney General, <u>Gilbert S. Rothenberg</u>, Acting Deputy
Assistant Attorney General, and <u>Kenneth L. Greene</u> were on brief for
appellee.

February 15, 2008

**STAHL**, **Senior Circuit Judge**. Plaintiff-appellant Richard M. Nault appeals the district court's decision denying his motion for summary judgment and granting summary judgment in favor of the United States. Nault argues that the district court erred in its interpretation of several agreed judgments entered by the Tax Court ("the Tax Court decisions"), embodying the terms of a settlement between the Internal Revenue Service ("IRS") and Frederick H. Behrens, as Tax Matters Partner ("TMP"), regarding the proper tax treatment of several agriculture-related limited partnerships organized by American Agri-Corp., Inc. ("AMCOR")[1] a California corporation (collectively the "AMCOR Partnerships" or "Partnerships"). For the reasons discussed below, we affirm.

## I.

Nault allegedly invested approximately $1,230,000.00 in five AMCOR Partnerships between 1984 and 1986. In 1987, the IRS began scrutinizing the AMCOR Partnerships' tax returns and issued Final Partnership Administrative Adjustment Notices disallowing certain deductions on the basis that the Partnerships' activities constituted a series of sham transactions lacking economic substance. After years of litigation, the IRS and the TMP reached a settlement in which 72% of the Partnerships' deductions were disallowed, the government agreed not to disallow investment tax

_____

[1]For a partial history of AMCOR and the related litigation, see Crop Assocs.-1986 v. Comm'r, 80 T.C.M. (CCH) 56, 2000 WL 976792, at *1-7 (T.C. July 17, 2000).

credits claimed by the partners, and the partners agreed not to file amended returns modifying any reported income from the Partnerships on which the partners had paid income taxes. Upon motion of the IRS, the Tax Court entered decisions with respect to each Partnership reflecting the terms of the settlement agreement.

Based upon the Tax Court decisions, the IRS issued adjustments to Nault's 1984, 1985, and 1986 income tax returns, and Nault paid the additional taxes resulting from the adjustments. Each of the Partnerships terminated during the lengthy Tax Court litigation, leaving Nault without any remaining basis in his partnership interests. In September 2002, Nault filed amended income tax returns for 1995, 1996, 1998, 1999, 2000, and 2001, asserting that his basis in the Partnerships should be "restored" to a level inversely proportionate to the Tax Court decisions' disallowance of 72% of the Partnerships' loss deductions. Nault claimed that he was entitled to an ordinary loss deduction for the taxable basis that was "restored" to his then-worthless partnership interests.

On December 18, 2002, the IRS denied Nault's request for a refund. Nault filed a complaint in federal district court on December 17, 2004, seeking to recover his purported overpayment of income tax pursuant to 26 U.S.C. § 7422 and 28 U.S.C. § 1346(a)(1). On February 9, 2007, the district court ruled on the parties' cross motions for summary judgment, granting summary judgment in favor of

the government and denying summary judgment to Nault.  See Nault v. United States, Civil No. 04-cv-479, 2007 WL 465310 (D.N.H. Feb. 9, 2007).  This appeal ensued.

## II.

We review de novo a district court's grant of summary judgment based on contract interpretation.  See John Hancock Life Ins. Co. v. Abbott Labs., 478 F.3d 1, 7 (1st Cir. 2006).  Summary judgment is appropriate where the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The parties agree that tax deductions are not permitted for transactions that lack economic substance and that the inquiry at hand--whether the Partnerships or transactions relevant to this appeal lacked economic substance--is confined to interpretation of the Tax Court decisions implementing the settlement between the IRS and the TMP.  Thus, a detailed recitation of the substantive law underlying the parties' dispute is unnecessary.  See United States v. ITT Cont'l Baking Co., 420 U.S. 223, 233, 236-37 (1975) (explaining that settlements incorporated into judicial decisions are self-contained within their four corners and, consequently, are detached from the substantive law giving rise to the litigation).

In construing a settlement subsequently adopted by a court, we apply the same basic rules that govern the interpretation of ordinary contracts.  See id. at 235-37; Rodi v. Ventetuolo, 941

-4-

F.2d 22, 28 (1st Cir. 1991); see also Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995) (explaining that federal common law requires us to be "guided by common-sense canons of contract interpretation" (citation omitted)). Interpretation of the terms of an unambiguous contract is a matter of law, subject to judicial resolution. See id. Quite simply, "[a]n unambiguous contract must be enforced according to its terms . . . ." Senior v. NSTAR Elec. & Gas Corp., 449 F.3d 206, 219 (1st Cir. 2006). Moreover, terms within a contract are accorded their "plain, ordinary, and natural meaning." Filiatrault v. Comverse Tech., Inc., 275 F.3d 131, 135 (1st Cir. 2001).

A contract is ambiguous where the disputed terms are facially inconsistent or reasonably susceptible to multiple, plausible interpretations. See Smart, 70 F.3d at 178. If a contract is ambiguous, we will consider extrinsic evidence to give effect to the parties' intent in forming the contract. Id. "The question of whether a contract is ambiguous is generally a question of law for the judge . . . ." Senior, 449 F.3d at 219.

Nault contends that the Tax Court decisions should not be interpreted to mean that the Partnerships or the underlying transactions lacked economic substance. In support, he asserts that the disputed language of the Tax Court decisions is ambiguous, that principles of construction favor his suggested interpretation,

and that extrinsic evidence conclusively establishes that the parties intended to effectuate his interpretation. These arguments are not well-founded.

First, the plain language of the Tax Court decisions unambiguously favors the government's interpretation. Section II of each Tax Court decision states:

> That the foregoing adjustments to partnership income and expense are attributable to transactions which lacked economic substance, as described in former I.R.C. § 6621(c)(3)(A)(v), so as to result in a substantial distortion of income and expense, as described in I.R.C. § 6621(c)(3)(A)(iv), when computed under the partnership's cash receipts and disbursements method of accounting; and
>
> That liabilities [in varying amounts] lack economic substance.

The district court held that this language unmistakably signaled that the adjustments of the loss deductions were made because the underlying transactions lacked economic substance, thus preventing Nault from now claiming tax deductions.[2]

---

[2]Nault argues that the government has waived the position that the underlying transactions lacked economic substance, in favor of the position that the Partnerships themselves lacked economic substance. This contention is irrelevant. The district court unequivocally held that "the disallowed deductions were attributable to transactions that lacked economic substance." Nault, 2007 WL 465310, at *5 (emphasis added). We are not limited in our review by the fact that the district court rendered its decision on grounds that the government may or may not have urged below. Nault's position, if accepted, would confine the lower court to choosing between the rationales submitted by the parties. This is not the law. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991) (holding that a "court is not limited to the

To escape this seemingly inexorable conclusion, Nault asserts that the presence of the phrase "so as to result in a substantial distortion of income and expenses" generates ambiguity. He argues that this phrase indicates that the underlying transactions may not have entirely lacked in economic substance, but merely distorted the Partnerships' balance sheet. To buttress this conclusion, he points out that the very next sentence simply declares that "liabilities" in varying amounts lacked economic substance without any such qualifying language. Thus, Nault argues, the district court violated the time-honored maxim that variances in language should not be treated as superfluous.

Nault is mistaken. The reference to former 26 U.S.C. § 6621(c)(v) (1988), which helps to define "tax motivated transactions," confirms that the transactions were "sham[s] or fraudulent transaction[s]," and therefore lacked economic substance. See, e.g., Durrett v. Comm'r, 71 F.3d 515, 517 (5th Cir. 1996). The phrase "so as to result in a substantial distortion of income and expense" simply tracks the language of the former 26 U.S.C. § 6621(c)(3)(iv) (1988), which likewise helps to define "tax motivated transactions." Thus, each phrase independently establishes that the adjustments were attributable to the Partnerships' tax-motivated activities. Admittedly, Nault is correct that transactions that lack economic substance are treated

particular legal theories advanced by the parties").

-7-

differently from those that merely result in a substantial distortion of income. Compare Dewees v. Comm'r, 870 F.2d 21, 30-31 (1st Cir. 1989) (refusing to permit deductions for sham transactions), with Mantell v. Comm'r, 66 T.C.M. (CCH) 697, 1993 WL 347409, at *10 (T.C. Sept. 13, 1993) (approving adjustments based on accounting methods that created a substantial distortion of income).

Nevertheless, the plain language of the Tax Court decisions still firmly establishes that the underlying transactions lacked economic substance.[3] Here, the greater implies the lesser--because the underlying transactions lacked economic substance, they necessarily resulted in a substantial distortion of income. Thus, the government's interpretation--that "[t]he decisions . . . state that the transactions resulted in a substantial distortion of income and expense because they lacked economic substance"--is by far the most natural reading of the disputed language. At the very least, it is logically consistent; Nault's proposed construction eviscerates the entire sentence. Under Nault's interpretation, the "substantial distortion" language must be read to modify the

_____

[3]Albeit in dicta, the Court of Federal Claims has reached a similar conclusion about these decisions. See Keener v. United States, 76 Fed. Cl. 455, 457 & n.2 (Fed. Cl. 2007) (stating that the Tax Court found "the various partnership transactions to be sham transactions"); see also Howell v. Comm'r, 94 T.C.M. (CCH) 104, 2007 WL 2126593, at *1 (T.C. July 25, 2007) (stating that the IRS and TMP "stipulated that the partnerships entered into transactions that lacked economic substance and created substantial distortions of partnership income") (emphasis added).

-8-

"lacked economic substance" language. We decline the invitation to mangle the English language by adopting an approach that defies basic rules of syntax and diction; the Tax Court clearly stated that the lack of economic substance "result[ed] in" the distortion of income, not the other way around.

Nault seeks additional support from the fact that the distortion language was not used in the next paragraph, which concerned the Partnerships' liabilities. The most obvious explanation for why this language was not used in reference to the Partnerships' liabilities is simply that the first paragraph referred to the underlying transactions themselves, while the second paragraph referred to the liabilities claimed by the Partnerships. Naturally, the erroneous liabilities themselves did not "result in a substantial distortion of income or expense." They simply lacked economic substance. Moreover, we will not declare perfectly clear language ambiguous merely because the Tax Court did not reiterate it verbatim in the very next sentence in dealing with a related, but not identical, matter.

Next, Nault argues that because the settlement "did not treat the Partnerships as lacking economic substance," the Tax Court decisions are ambiguous.[4] Nault's contention is based on a

_____

[4]Nault cites the Eleventh Circuit's decision in Fickling v. United States, 507 F.3d 1302 (11th Cir. 2007), as authority for this proposition. Nault, however, ignores a crucial factual distinction between the two cases. There is no indication that the disputed settlement discussed in Fickling contained any language

fundamentally erroneous conception of the Tax Court decisions, which approved a settlement. See Miller Tabak Hirsch & Co. v. Comm'r, 101 F.3d 7, 10 (2d Cir. 1996) (explaining that in a judicially-approved settlement parties are "free to settle the case in any manner not violative of law or public policy, regardless of what the result might have been had the parties gone to trial"). Parties to a settlement, almost by definition, eschew the possibility of obtaining some portion of what they would like in exchange for certain terms with which they can live. See Rodi, 941 F.2d at 27 (stating that a settlement "'normally embodies a compromise,' within the limits of which the litigants . . . must be prepared to live" (quoting United States v. Armour & Co., 402 U.S. 673, 681 (1971))). The fact that the IRS chose to settle rather than risk the hazards of litigation is no more a concession that the transactions at hand possessed economic substance than a defendant's decision to settle a dubious lawsuit for pennies on the dollar is a concession that the suit had merit. Indeed, there is little doubt that parties occasionally settle claims simply to avoid the hassle, uncertainty, and expense of litigation even where a favorable outcome seems all but certain.

---

labeling the transaction in question as lacking economic substance. Indeed, the Eleventh Circuit characterized the settlement in question as "noncommittal" concerning whether the underlying transaction was a sham. Id. at 1305.

-10-

Here, it was perfectly permissible for the IRS to insist upon language that declared the transactions to lack economic substance--perhaps anticipating claims plaintiffs such as Nault might make--while simultaneously making certain concessions to the taxpayers. It was incumbent upon the TMP to dispute any language that he did not wish included in the Tax Court decisions. See Rodi, 941 F.2d at 27 (admonishing that litigants must abide by terms of a settlement even where they prove more onerous than originally anticipated). In the end, therefore, Nault remains confined to the language agreed to in the settlement. See In re New Seabury Co. Ltd. P'ship, 450 F.3d 24, 31, 39 (1st Cir. 2006) (rejecting the district court's "functional analysis" of the parties' stipulation in favor of the bankruptcy court's analysis of its plain language).

Finally, Nault argues that, even if the plain language of the Tax Court decisions is unambiguous, the district court nevertheless erred by failing to consider extrinsic evidence. First, it is elementary that we do not ordinarily examine extrinsic evidence to alter or clarify the terms of an otherwise unambiguous contract. See Smart, 70 F.3d at 179. Nevertheless, "in the exceptional case, a latent ambiguity in seemingly clear contract language may require us to consider extrinsic evidence to determine the actual object of the parties' agreement." Coffin v. Bowater Inc., 501 F.3d 80, 97 (1st Cir. 2007).

This is not such a case. Nault's proposed interpretation of the Tax Court decisions is not merely strained, but flatly contradictory to the plain meaning of its terms. In essence, he "argue[s] that the [disputed] language does not mean what it says." Id. at 98. If the language of the Tax Court decisions does not comport with what the parties intended, then the TMP should have insisted upon different language.

Finally, we note that Nault dramatically overstates the persuasive force of the extrinsic evidence that he has proffered. It is by no means so conclusive as he suggests.[5] He directs our attention to a written summary regarding the settlement, prepared by the IRS, stating, inter alia, that each partner "may have a capital gain or loss upon his termination from the partnership" (emphasis added). This summary, however, was nonbinding, the specific section in question was designated as informational, the clause was permissive, and the provision referred only to the partner's capital contribution. Nault also points to a letter he received from the IRS indicating that the Service had made "[a] determination . . . that allow[ed] for capital treatment of these losses." This statement is certainly peculiar--and inconsistent

_____

[5]In addition to noting the limited probative value of Nault's extrinsic evidence, we observe that the government likewise adduced extrinsic evidence--an affidavit from Margaret K. Hebert, an IRS attorney responsible for the AMCOR litigation--to buttress its own position. We need not discuss this evidence further, however, because it is unnecessary to our conclusion.

with the IRS's current position.  This letter, however, cannot serve as a definitive guide for our interpretation of Tax Court decisions executed more than a year previously.  Additionally, the court notes that the same letter notified Nault of the IRS's rejection of his claims for a deduction for an ordinary loss related to his "restored" basis in the Partnerships.

In summary, Nault's arguments obfuscate what is, in reality, a very simple case.  The plain language of the Tax Court decisions indicates that the disallowed loss deductions were based on transactions that lacked economic substance. We have no jurisdiction to determine whether the relevant transactions actually did have economic substance--the sole matter within our purview is determining what the Tax Court meant by its decisions. The Tax Court's determination, that the transactions lacked economic substance, is unambiguous.

## III.

The judgment of the district court is <u>affirmed</u>.